# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN-WATERLOO DIVISION

| | |
|---|---|
| ANDREW LEE PETERSON,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>KELLIE WEATHERLY,<br><br>　　　　Defendant. | No. C03-2062-MWB<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## *I. INTRODUCTION*

This matter is before the court on motion of the defendant Kellie Weatherly ("Weatherly") for summary judgment, filed May 11, 2005. (Doc. No. 26) The plaintiff Andrew Peterson ("Peterson") untimely resisted Weatherly's motion for summary judgment on June 8, 2005. (Doc. No. 28) Weatherly filed a reply on June 13, 2005. (Doc. No. 29) Peterson filed a supplement to his resistance on June 15, 2005. (Doc. No. 31) By order dated January 18, 2005 (Doc. No. 25), this matter was referred to the undersigned United States Magistrate Judge for the issuance of a report and recommended disposition.

A former inmate of the Black Hawk County Jail in Waterloo, Iowa, Peterson filed this action against Weatherly under 42 U.S.C. § 1983 to redress the alleged deprivation of his constitutional rights. (See Doc. No. 12) Peterson contends Weatherly violated his First Amendment rights by placing him in medical segregation.[1]  (Id.)  Specifically,

---

[1] The First Amendment to the United States Constitution provides:
　　Congress shall make no law respecting an establishment of religion, or
　　prohibiting the free exercise thereof; or abridging the freedom of speech,
　　or of the press; or the right of the people peaceably to assemble, and to
　　petition the Government for a redress of grievances.
U.S. Const., amend. I.  The First Amendment is applicable to the states through the Fourteenth Amendment. Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S. Ct. 900, 903, 84 L. Ed. 2d 1213 (1940).

Peterson alleges he complained to Weatherly about the medical attention he received, Weatherly retaliated by placing him in medical segregation, and he developed ischial ulcers while confined in medical segregation. (Id.) For the alleged violation of his constitutional rights, Peterson seeks declaratory relief, actual damages, exemplary damages, court costs, attorney fees pursuant to 42 U.S.C. § 1988, and further relief as the court deems appropriate. (Id.)

As a preliminary matter, Weatherly asserts in her motion for summary judgment that she is unsure of the specific First Amendment claim Peterson is advancing because he did not comply with the initial disclosure requirements of Rule 26 of the Federal Rules of Civil Procedure. (See Doc. No. 26) Weatherly then claims there are no disputed material facts and she is entitled to judgment as a matter of law. (Id.) In support of her claim that summary judgment is appropriate, Weatherly argues (1) she did not and could not place Peterson in medical segregation because she does not have the authority to place inmates in any kind of segregation; (2) she did not cause Peterson's ischial ulcers because she does not have the authority to require or force an inmate to remain sedentary and immobile, which are the conditions that led to the development of Peterson's ulcers; and (3) even if she placed Peterson in medical segregation and caused Peterson's ischial ulcers, she did not act "under color of state law" as required by 42 U.S.C. § 1983. (Id.) Alternatively, Weatherly argues Peterson's claim should be dismissed as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i). (Id.)

In his resistance to Weatherly's motion for summary judgment, Peterson asserts Weatherly is responsible for his placement in segregation, and the segregation caused him to develop ischial ulcers. (See Doc. No. 28) He argues Weatherly retaliated against him for complaining about his medical treatment and the First Amendment prevents retaliation. (Id.) Peterson also disagrees with Weatherly's contention that she is not a state actor. (Id.)

In her reply, Weatherly contends (1) Peterson has not presented any facts that demonstrate the existence of a genuine issue for trial; (2) Peterson's First Amendment argument is irrelevant to the outcome of this case; and (3) the development of the factual record in this case has been impeded by Peterson's non-compliance with the mandatory initial disclosure requirements of Rule 26 of the Federal Rules of Civil Procedure. (See Doc. No. 29) With respect to her first contention, Weatherly claims Peterson has failed to address directly her assertion that she does not have the authority to place inmates in any kind of segregation or to require an inmate to remain confined in particular conditions. (Id.) Concerning her second contention, Weatherly argues Peterson's First Amendment assertions are irrelevant given the undisputed facts regarding her personal involvement or lack thereof. (Id.) Regarding her third contention, Weatherly asserts Peterson failed to disclose persons likely to possess discoverable information, documents, and things which he may use to support his claim, and failed to provide a computation of his damages. (Id.)[2]

Finding the motion for summary judgment to be fully submitted and ready for decision, the court turns now to consideration of the motion.

## II. STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment and provides that either party to a lawsuit may move for summary judgment without the need for supporting affidavits. See Fed. R. Civ. P. 56(a), (b). Rule 56 further states that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

---

[2] In her reply, Weatherly indicates Peterson failed to sign the affidavit in support of his resistance. (Id.) Presumably in response, Peterson supplemented his resistance by submitting a signed affidavit on June 15, 2005. (Doc. No. 31) Except for the fact that it is signed and updates the place where he is incarcerated, the June 15, 2005, affidavit is identical to the unsigned one he submitted on June 8, 2005.

> if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). A court considering a motion for summary judgment "must view all of the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts." Webster Indus., Inc. v. Northwood Doors, Inc., 320 F. Supp. 2d 821, 828 (N.D. Iowa 2004) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); and Quick v. Donaldson Co., 90 F.3d 1372, 1376-77 (8th Cir. 1996)).

The party seeking summary judgment must "'inform[ ] the district court of the basis for [the] motion and identify[ ] those portions of the record which show lack of a genuine issue.'" Webster Indus., 320 F. Supp. 2d at 829 (quoting Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992), in turn citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552-53, 91 L. Ed. 2d 265 (1986)). A genuine issue of material fact is one with a real basis in the record. Id. (citing Hartnagel, 953 F.2d at 394, in turn citing Matsushita, 475 U.S. at 586-87, 106 S. Ct. at 1356). Once the moving party meets its initial burden under Rule 56 of showing there is no genuine issue of material fact, the nonmoving party, "by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Webster Indus, 320 F. Supp. 2d at 829 (citing, inter alia, Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; and Rabushka ex rel. United States v. Crane Co., 122 F.3d 559, 562 (8th Cir. 1997)).

Addressing the quantum of proof necessary to successfully oppose a motion for summary judgment, the Supreme Court has explained that the nonmoving party must produce sufficient evidence to permit "a reasonable jury [to] return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). Furthermore, the Supreme Court has held the trial

court must dispose of claims unsupported by fact and determine whether a genuine issue exists for trial, rather than weighing the evidence and determining the truth of the matter. See Anderson, 477 U.S. at 249, 106 S. Ct. at 2510; Celotex, 477 U.S. at 323-24, 106 S. Ct. at 2552-53; Matsushita, 475 U.S. at 586-87, 106 S. Ct. at 1356.

The Eighth Circuit recognizes that "summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." Wabun-Inini v. Sessions, 900 F.2d 1234, 1238 (8th Cir. 1990) (citing Fed. R. Civ. P. 56(c)). The Eighth Circuit, however, also follows the principle that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. (quoting Celotex, 477 U.S. at 327, 106 S. Ct. at 2555); see also Hartnagel, 953 F.2d at 396.

Thus, the trial court must assess whether a nonmovant's response would be sufficient to carry the burden of proof at trial. Hartnagel, 953 F.2d at 396 (citing Celotex, 477 U.S. at 322, 106 S. Ct. at 2552). If the nonmoving party fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof, then the moving party is "entitled to judgment as a matter of law." Celotex, 477 U.S. at 323, 106 S. Ct. at 2552; Woodsmith Pub. Co. v. Meredith Corp., 904 F.2d 1244, 1247 (8th Cir. 1990). However, if the court can conclude that a reasonable jury could return a verdict for the nonmovant, then summary judgment should not be granted. Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; Burk v. Beene, 948 F.2d 489, 492 (8th Cir. 1991); Woodsmith, 904 F.2d at 1247.

### III. MATERIAL FACTS

Peterson was an inmate at the Black Hawk County Jail ("BHCJ") from October 1, 2002, to March 18, 2003. (Doc. No. 26-3, pp. 14-20; Doc. No. 26-4, p. 1; Doc. No. 28-4, p. 1) Peterson is a diabetic. (Doc. No. 12, p. 2; Doc. No. 23, p. 1)

Administrative and medical staff required Peterson to follow certain rules and regulations that related to his diabetic diet. (Doc. No. 23, pp. 1-2) On October 17, 2002, BHCJ staff announced the time when inmates would receive their medications, and they instructed inmates bring a cup of water with which to take their medications. (Doc. No. 26-3, p. 13) Peterson failed to follow these instructions, and had to be sent back to his cell to retrieve his cup. (Doc. No. 26-3, pp. 13, 15, 18) His behavior violated rule 2.5 of the BHCJ, and as a result of the violation, he was locked down in his cell for a period of eight hours. (Doc. No. 26-3, pp. 13, 15) Deputy Everett authorized the lock-down. (Doc. No. 26-3, pp. 9, 13, 15, 18)

On October 20, 2002, Peterson violated Rule 1.13 of the BHCJ by stealing. (Doc. No. 26-3, pp. 12, 15, 17) Peterson took a piece of cake from a dinner tray. (Doc. No. 26-3, p. 12) Deputy Norton observed the theft on a monitor, and other inmates saw Peterson take the piece of cake. (Doc. No. 26-3, p. 12) As a result of violating Rule 1.13, Peterson was reclassified and placed in A-1 – Maximum Security. (Doc. No. 26-3, pp. 12, 15, 17) Deputy Norton authorized this action. (Doc. No. 26-3, pp. 9, 12, 15, 17) Peterson remained in A-1 from October 20, 2002, until October 30, 2002. (Doc. No. 26-3, p. 15)

On November 1, 2002, Peterson was placed in a warmer room because of his diabetes. (Doc. No. 26-3, p. 15) Peterson was informed by the medical staff that he needed to fill out a diabetic commissary sheet. (Doc. No. 26-3, pp. 8-9, 17) On November 8, 2002, a nurse recommended that Peterson place a wet rag on his buttocks to care for boils. (Doc. No. 26-3, p. 15) On November 18, 2002, Peterson was warned about having paper in his window. (Doc. No. 26-3, p. 15) On November 22, 2002, Peterson refused to take his evening medication. (Doc. No. 26-3, p. 15) On December 8, 2002, Peterson arrived late to the dining hall. He did not want to wait, so he refused to eat lunch. (Doc. No. 26-3, p. 15) On December 21, 2002, Peterson was warned about entering a cell without permission. (Doc. No. 26-3, p. 16) On

December 27, 2002, Peterson was locked down in his cell until supper because of noise. (Doc. No. 26-3, p. 16)

On January 3, 2003, Peterson disrupted and interfered with the security and daily operations of the BHCJ by becoming very upset when he felt he did not have enough french fries. He apparently adopted a confrontive attitude and indicated he did not want to eat. (Doc. No. 26-3, pp. 11, 18) He told Deputy Chase he was going to "snap." (Doc. No. 26-3, p. 11) Peterson refused to eat supper. (Doc. No. 26-3, p. 16) His behavior violated rule 2.5 of the BHCJ. (Doc. No. 26-3, pp. 11, 18) As a result of the violation, Peterson was locked down in his cell for the rest of the night. (Doc. No. 26-3, pp. 11, 16, 18) Deputy Chase authorized this action. (Doc. No. 26-3, pp. 9, 11, 16, 18) In January of 2003, Peterson complained that staff at the BHCJ failed to respond in a timely manner to his need for a snack or other food to help him with his low blood sugar level. (Doc. No. 12, p. 2)

Based on a written contract, NaphCare, Inc. provides nursing services at the BHCJ. (Doc. No. 26-3, pp. 46-62; Doc. No. 26-4, p. 1; Doc. No. 28-4, p. 1) NaphCare, Inc. employed the defendant Weatherly as a nurse. (Doc. No. 26-4, p. 1; Doc. No. 28-4, p. 1) Although the employees of NaphCare, Inc. have authority to request medical observation (Doc. No. 26-4, p. 1; Doc. No. 28-4, p. 1), Peterson was never placed under medical observation. (Doc. No. 26-3, pp. 14-20; Doc. No. 26-4, p. 2; Doc. No. 28-4, p. 1) Weatherly and Peterson argued about the medical attention he was receiving. (Doc. No. 12, p. 2; Doc. No. 23, p. 2)

On January 9, 2003, Deputy Fulks placed Peterson on administrative segregation, and Peterson was moved to A-2 – Special Housing. (Doc. No. 26-3, pp. 16, 27; Doc. No. 26-4, p. 1; Doc. No. 28-4, p. 1) Deputy Fulks authorized this action because of Peterson's disruptive behavior and for the safety and security of the facility. (Doc. No. 26-3, pp. 9, 16, 25) On January 10, 2003, Peterson was permitted to leave his cell

on A-2 for one hour. (Doc. No. 26-3, pp. 16, 27). On January 11, 2003, Peterson was placed in a cell on A-3 – Maximum Security. (Doc. No. 26-3, pp. 16, 27).

On January 19, 2003, Peterson violated Rule 3.9 of the BHCJ by possessing unissued items in his cell; i.e., salt and pepper packets. (Doc. No. 26-3, pp. 16, 18) As a result, Peterson was locked down in his cell for twenty-three hours. (Doc. No. 26-3, p. 16) Deputy Everett authorized this action. (Doc. No. 26-3, pp. 16, 18) On the same day, Peterson refused to take his medication. (Doc. No. 26-3, p. 16)

On January 25, 2003, Sergeant Hostetler reviewed Peterson's classification. (Doc. No. 26-3, p. 16) On February 1, 2003, Peterson received hydrocortisone from the medical staff. (Doc. No. 26-3, p. 16) On February 6, 2003, Peterson was moved to A-1 to make space in A-3. (Doc. No. 26-3, p. 16) On February 7, 2003, Peterson argued with BHCJ medical staff. (Doc. No. 26-3, p. 16) Deputy Ohrt and Sergeant Mossman warned and advised Peterson about his conduct. (Doc. No. 26-3, p. 16)

On February 14, 2003, Peterson's classification was reviewed by Sergeant Hostetler and Deputy Neff. (Doc. No. 26-3, p. 17) Based on their review, Peterson was approved for General Population, and he was moved to General Population the same day. (Doc. No. 26-3, p. 17) From January 9, 2003 to February 14, 2003, Peterson spent time in either Special Housing or Maximum Security. (Doc. No. 26-3, pp. 16-17)

While confined in administrative segregation, Peterson developed ischial ulcers. (Doc. No. 26-4, p. 2; Doc. No. 28-4, p. 1) Ulcers are a local defect or excavation of the skin's surface that are produced by the sloughing or shedding of inflammatory, necrotic tissue. (Doc. No. 26-4, p. 2; Doc. No. 28-4, p. 1) Peterson's ulcers are ischial in the sense that they developed on his ischium – the inferior dorsal part of the hip bone (i.e., Peterson's ulcers developed on his buttocks). (Doc. No. 26-4, p. 2; Doc. No. 28-4, p. 1) These sorts of ulcers, often referred to as pressure ulcers, decubital ulcers, bed sores, or pressure sores, are usually caused by prolonged pressure in a patient who lies too still in bed for a long period of time. (Id.) The pressure occludes or obstructs the

blood flow to the area leading to a deficiency of blood in a particular area (ischemia) and tissue death (necrosis). (Doc. No. 26-4, p. 2; Doc. No. 28-4, p. 1) Peterson's ischial ulcers most likely developed because he remained seated and immobile for a long period of time. (Doc. No. 26-4, p. 2; Doc. No. 28-4, p. 1)

## IV. ANALYSIS

### A. *Overview of Civil Rights Claims Under 42 U.S.C. § 1983*

Title 42 U.S.C. § 1983, in relevant part, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 685, 98 S. Ct. 2018, 2033, 56 L. Ed. 2d 611 (1978). However, 42 U.S.C. § 1983 provides no substantive rights. Albright v. Oliver, 510 U.S. 266, 271, 114 S. Ct. 807, 811, 127 L. Ed. 2d 114 (1994); Graham v. Conner, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989); Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617, 99 S. Ct. 1905, 1916, 60 L. Ed. 2d 508 (1979). "One cannot go into court and claim a 'violation of [42 U.S.C.] § 1983' — for [42 U.S.C.] § 1983 by itself does not protect anyone against anything." Chapman, 441 U.S. at 617, 99 S. Ct. at 1916. Rather, 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983. See also Albright, 510 U.S. at 271, 114 S. Ct. at 811 (42 U.S.C. § 1983 "merely provides a method for vindicating federal rights elsewhere conferred"); Graham,

490 U.S. at 393-94, 109 S. Ct. at 1870 (same); Maine v. Thiboutot, 448 U.S. 1, 4, 100 S. Ct. 2502, 2504, 65 L. Ed. 2d 555 (1980) ("Constitution and laws" means 42 U.S.C. § 1983 provides remedies for violations of rights created by federal statute, as well as those created by the Constitution). Thus, to state a claim under 42 U.S.C. § 1983, a plaintiff must establish: (1) the violation of a right secured by the Constitution or laws of the United States, and (2) the alleged deprivation of that right was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55, 101 L. Ed. 2d 40 (1988).

### *B. Peterson's First Amendment Claim*

In her motion for summary judgment, Weatherly argues she did not take, and could not have taken, the actions Peterson alleges she took, and consequently, she did not violate Peterson's First Amendment rights. (Doc. No. 26-2, p. 4) Although she provided nursing services to inmates at the BHCJ, Weatherly contends her nursing duties did not include disciplining inmates, and she did not have any control over where inmates were housed in the BHCJ. (Id.) Specifically, Weatherly claims she did not have authority to place inmates in any kind of segregation. (Id.) At most, she could recommend that an inmate be placed under observation for a medical or mental health need. (Id.) Weatherly also asserts that at the time Deputy Fulks placed Peterson in administrative segregation, she was not working at the BHCJ. (Id. at pp. 4-5) In addition, Weatherly maintains she did not cause Peterson's ischial ulcers because she did not have the authority to require or force him to remain sedentary and immobile, which were the conditions that led to the development of his ulcers. (Id. at pp. 5-6) Even when confined in Special Housing, Peterson was fully capable of repositioning himself and moving around, and thus, Weatherly argues, she cannot be held liable for something Peterson himself could have prevented. (Id.)

Weatherly relies on the affidavits of Captain Mark Johnson, the Administrator of the BHCJ, and Paula Moore, the Health Services Administrator, to support her position. Captain Johnson states, in relevant part, as follows:

> Mr. Peterson was placed in Administrative Segregation. Administrative Segregation is originated by law enforcement personnel, not medical personnel. Medical does not have any ability to put someone in Administrative Segregation. At most, medical could recommend observation for a medical or mental health need. They do not make recommendations on disciplinary structure.
>
> Mr. Peterson was placed in Administrative Segregation for disruptive behavior, not a medical issue. . . .
>
> According to the booking report, Mr. Peterson was booked in on October 1, 2002. . . . The booking report very specifically sets forth each and every issue as it arose with Mr. Peterson. At no time does the booking report refer to medical suggesting or recommending Mr. Peterson be placed in any type of segregation. Mr. Peterson was placed in administrative segregation on January 9, 2003, by Deputy Fulks. . . .
>
> Law enforcement personnel, and in particular Deputy Fulks, initiated Administrative Segregation as a result of disruptive behavior and for the safety and security of the facility. Ms. Weatherly was not involved in the actual decision or placement of Mr. Peterson in Administrative Segregation.

(Doc. No. 26-3, pp. 8-9) In her affidavit, Paula Moore stated, in relevant part, as follows:

> As an employee of NaphCare, we are involved with the medical care at the Black Hawk County Jail. We do not have medical segregation, nor do we have any authority to place any inmate in administrative segregation. At most, we have the ability to request medical observation. We do not use the term segregation for medical observation. If we felt someone was in need of medical observation, we would notify the senior ranking officer and request that inmate be put in medical observation. Medical observation is a situation where

> there is continuous camera monitoring 24 hours a day, seven days a week. This is for the safety of the inmate. It is not utilized for behavior issues.
>
> As previously mentioned, Mr. Peterson has never been put under medical observation. Upon my review of the documentation, Mr. Peterson was placed in [Special Housing] for a period of his stay, but the jail documents clearly provide that it was because of a code violation and he was put in administrative segregation.
>
> In further review of the records and documentation, it should be noted that Mr. Peterson was placed in administrative segregation on January 9, 2003, at 11:20 a.m. Kelly Weatherly was working third shift and not working at the time Mr. Peterson was placed in administrative segregation.

(Doc. No. 26-3, pp. 22-23)

In his resistance, Peterson contends Weatherly was responsible for his placement on segregation status in January of 2003, and the segregation caused him to develop ischial ulcers, which were treated in February and March of 2003. (Doc. No. 28-1, p. 1) Peterson claims as follows:

> (1) he repeatedly complained to Weatherly about his diabetic condition;
>
> (2) he was placed in administrative segregation as a result of his complaints;
>
> (3) the documents do not indicate what specific aspect of his disruptive conduct caused him to be placed in administrative segregation, and therefore, it is possible he was placed in administrative segregation because he complained about his medical treatment;
>
> (4) he insisted that his medical concerns be addressed or he would file a grievance; and
>
> (5) he developed ischial ulcers while in administrative segregation because he did not have the opportunity to move around and he sat on a hard bed.

(Doc. No. 28-3, p. 1) To support his resistance, Peterson submitted an affidavit in which he states as follows:

> I was an inmate at the [BHCJ] in January 2003. I am a diabetic. I was keeping my diabetic condition under control at the BHCJ in January 2003. In January 2003, I complained that the staff at the BHCJ had failed to respond quickly to my need for a snack or other food to help [me] with [my] low blood sugar. [Weatherly] and I argued about the medical attention I was receiving. I complained to her about the need for a snack or other food. I told her that she was not taking my condition seriously and I was going to complain to higher authorities. After the argument and in retaliation for my complaints, [Weatherly] had me placed in segregation. I believed that I was placed in medical segregation. I now see that the records say I was in administrative segregation for being disruptive. I believe that I was placed in segregation for arguing with [Weatherly] about my medical treatment. After I was placed in segregation, I developed ulcers.

(Doc. No. 28-2, pp. 1-2; see Doc. No. 31 & footnote 2, supra)

In her reply, Weatherly argues Peterson failed to designate specific facts which create a triable controversy. (Doc. No. 29) Weatherly maintains Peterson did not create a genuine issue for trial regarding the following facts:

> (1) Peterson was not put on administrative segregation status by Weatherly;
>
> (2) Peterson was placed on administrative segregation status for disruptive behavior, not for a medical issue;
>
> (3) Weatherly had no authority to place Peterson in administrative segregation; and
>
> (4) the fault for the development of Peterson's ischial ulcers rests with Peterson because he remained sedentary and immobile while confined in administrative segregation.

(Doc. No. 29, p. 2)

As previously explained, Peterson must establish that Weatherly violated a right secured by the Constitution or laws of the United States to state a claim under 42 U.S.C.

§ 1983. He must show facts, not simply conclusions, to show Weatherly personally deprived him of his constitutional rights.

Although he spends a significant amount of time discussing what constitutes retaliation under the First Amendment, Peterson offers no specific evidence to show Weatherly was responsible for placing him in administrative segregation. In his affidavit, Peterson states his belief that Weatherly had him placed in administrative segregation because he argued with her about his medical treatment, and he suggests this conclusion is correct because BHCJ records do not indicate what specific aspect of his disruptive conduct caused him to be placed in administrative segregation. Because they are conclusory and unsupported by the record, the statements contained in Peterson's affidavit are insufficient to preclude summary judgment. See Miller v. Citizens Sec. Group, Inc., 116 F.3d 343, 346 (8th Cir. 1997) ("A conclusory statement in an affidavit, however, cannot create a genuine issue of material fact which precludes summary judgment."). When considered without Peterson's conclusory and speculative statements, the record clearly shows Weatherly had nothing to do with Peterson's placement in administrative segregation. Indeed, the record is devoid of evidence linking Weatherly to any alleged constitutional wrong. See Mark v. Nix, 983 F.2d 138, 139-40 (8th Cir. 1993) (42 U.S.C. § 1983 requires some personal involvement or responsibility); Madewell v. Roberts, 909 F.2d 1203, 1208 (8th Cir. 1990) (same); Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985) (no 42 U.S.C. § 1983 claim lies where allegations contain no facts showing defendant's personal involvement in incident that harmed plaintiff); cf. Beck v. LaFleur, 257 F.3d 764, 766 (8th Cir. 2001) (plaintiff failed to allege sufficient personal involvement by any of the defendants to support his claim) (citing Ellis v. Norris, 179 F.3d 1078, 1079 (8th Cir. 1999)). Without any facts showing Weatherly's direct personal involvement, a causal connection cannot be formed. Accordingly, Weatherly is entitled to judgment in her favor as a matter of law.

### *C. Other Grounds or Arguments Regarding Summary Judgment*

Having concluded Peterson's First Amendment claim fails as a matter of law, the court does not need to address Weatherly's remaining arguments in favor of her motion for summary judgment.

### *V. CONCLUSION*

For the foregoing reasons, **IT IS RECOMMENDED**, unless any party files objections[3] to the report and recommendation in accordance with 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b) within ten (10) days of the service of a copy of this report and recommendation, that Weatherly's motion for summary judgment be granted, and judgment be entered in favor of Weatherly and against Peterson.

**IT IS SO ORDERED.**

**DATED** this 1st day of November, 2005.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[3] The parties must specify the parts of the report and recommendation to which objections are made. In addition, the parties must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. See Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. See Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); Thompson v. Nix, 897 F.2d 356, 357-58 (8th Cir. 1990).